**Eugene CAPPELLO, Plaintiff,**

v.

**The State of NEW YORK, et al., Defendants.**

**No. 00 CV. 4072(CM).**

United States District Court, S.D. New York.

Dec. 19, 2000.

Eugene Cappello, Carmel, NY, Pro se.

Carolyn Cairns Olson, Assistant Attorney General, New York City, for State Defendants.

Lissette M. Figueroa, White Plains, NY, Assistant County Attorney for Defendant County of Westchester.

**MEMORANDUM DECISION AND ORDER GRANTING STATE DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

MCMAHON, District Judge.

*Background*

Plaintiff, Eugene Cappello ("Cappello"), is a party to an ongoing matrimonial action that is pending in the Supreme Court, Westchester County, New York. (Compl. ¶ 19; *see also,* letter from A.A.G. Carolyn Cairns Olsen to Hon. Denny Chin of July 25, 2000.) Defendant, Hon. Joan B. Lefkowitz, has from time to time presided over the divorce proceedings.

On January 26, 1999, Plaintiff entered into a stipulation obligating him to make two payments of $37,500 each to his wife: the first on February 22, 1999, and the second on March 22, 1999. (Transcript of Mar. 1, 1999 Sentencing Appearance before Hon. Joan B. Lefkowitz at 4, *Cappello v. Cappello,* index no. 16699/97 ("Mar.Transcript").) When Plaintiff appeared in court on February 22, 1999 without the first payment, Justice Lefkowitz ordered Plaintiff to make that payment in court on March 1, 1999. (Mar. Transcript at 7.) During the week between February 22 and March 1, 1999, Plaintiff's attorney moved for a stay of enforcement, based upon an inability to pay, which was denied by Justice Lefkowitz from the bench on March 1, 1999. (Mar. Transcript at 4.) Plaintiff appeared in court before Justice Lefkowitz on March 1, 1999 and failed to make the ordered payment. (Mar. Transcript at 3.) Before incarcerating Plaintiff, Justice Lefkowitz stated "there ha[d] been no change of circumstance since he agreed to ... pay, and nothing has been paid. There is nothing here that I can even forgive him on." (Mar. Transcript at 6–7.) The Judge then found Plaintiff in contempt of her order to pay and sentenced him to 90 days in the Westchester County Jail. (Mar. Transcript at 7.)

Although Plaintiff does not express a clear understanding of his obligations, it appears from the record that the stipulation was never withdrawn or amended, nor was any order arising from it ever vacated. (Mar. Transcript at 7; *see also* Transcript of Sept. 22, 2000 Appearance before Hon. Colleen McMahon at 8, *Cappello v. The State of New York, et al.,* index no. 00CV4072 ("Sept.Transcript").) Moreover, Plaintiff's attorney stated at the very beginning of the proceedings on March 1 that Plaintiff's son had accompanied him to court to drive Plaintiff's car home "[i]f Mr. Cappello is incarcerated today," (Mar. Transcript at 3), which strongly suggests that incarceration came as no surprise to Plaintiff.

Plaintiff served 15 days of his 90 day sentence. (Compl.¶ 24.) He was released on March 15, 1999. (See *id.*)

Plaintiff appealed the order holding him in contempt. On July 31, 2000, the Appellate Division reversed Justice Lefkowitz' contempt order, holding that she was *"without jurisdiction* to punish the defendant for contempt." *Cappello v. Cappello,* 274 A.D.2d 539, 712 N.Y.S.2d 42, 2000 N.Y.Slip Op. 07195 (2000), (emphasis added).

Plaintiff then filed a complaint against his wife's attorneys with defendant Grievance Committee for making an oral, rather than a written, application for contempt to Justice Lefkowitz, and alleging a conspiracy between them to cause Plaintiff harm. (Compl.¶ 26.) According to the complaint, defendant Fuchs, an *attorney* with the Grievance Committee, informed Plaintiff that his complaint would not be pursued. (Compl.¶ 26.)

Plaintiff filed the instant complaint on May 31, 2000, naming the State of New York, the Grievance Committee and its attorney, Freda Fixler Fuchs, the County of Westchester, the Norwood Jackson Correctional Facility, and Hon. Joan B. Lefkowitz as defendants. Insofar as the complaint seeks to hold Justice Lefkowitz personally liable for her erroneous contempt ruling, Plaintiff's claims arise under 42 U.S.C. § 1983. (Compl.¶¶ 1, 2.) Cappello alleges that Justice Lefkowitz, acting under color of law as a New York State Supreme Court Justice, deprived him of the "rights, privileges, and immunities secured by the Constitution of the United States" when she summarily ordered him to be incarcerated for contempt on March 1, 1999. (Compl.¶ 31.)

*Grounds for Decision*

Plaintiff bases his § 1983 claim on the statements made by the Appellate Division in overturning the contempt, specifically, that Justice Lefkowitz was *without jurisdiction* to hold Plaintiff in contempt on the oral application of his wife's counsel, and

that she *failed to comply with procedural rules* that such an application be made in writing. (*Id.*)[1] Plaintiff contests his obligation to pay under the stipulation agreement, but his protestations are not supported by the record. Rather, the record indicates that Plaintiff was clearly in violation of a court order to pay when he was found in contempt, and that the only issue before this Court is whether Justice Lefkowitz' failure to afford him proper written notice before holding him in contempt and incarcerating him renders her personally liable in damages. This Court finds that it does not.

*Discussion:*

■ It is well-settled that judges are immune from suits for damages arising out judicial acts. *See Bradley v. Fisher,* 80 U.S. 335, 13 Wall. 335, 20 L.Ed. 646 (1871); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Stump v. Sparkman,* 435 U.S. 349, 359, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Forrester v. White,* 484 U.S. 219, 225, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); *Mireles v. Waco,* 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991); *Tucker v. Outwater,* 118 F.3d 930, 935 (2nd Cir.1997). This immunity dates to medieval times. *See Forrester,* 484 U.S. at 225, 108 S.Ct. 538. Judges are frequently called upon to make decisions which disappoint "some of the most intense and ungovernable desires that people can have." *Id.* at 226, 108 S.Ct. 538. Personal liability for each decision would result in an "avalanche of suits" that would necessarily diminish the judge's authority to settle disputes. *Bradley,* 80 U.S. at 347, 13 Wall. 335. Indeed, society's increased reliance on the litigation process could not have arisen without some protection for judges for determinations made in their judicial capacity.

In addition, the availability of appellate review now ensures that "[m]ost judicial mistakes or wrongs are open to correction through ordinary mechanisms of review, which are largely free of the harmful side-effects inevitably associated with exposing judges to personal liability." *Forrester,* 484 U.S. at 227, 108 S.Ct. 538. Finally, a judge can be removed from office by impeachment for egregious behavior. *See Bradley,* 80 U.S. at 350, 13 Wall. 335 (judge who acts "with partiality, or maliciously, or corruptly, or arbitrarily, or oppressively ... may be called to an account by impeachment ..."). Appellate review and impeachment are the appropriate avenues for correcting judicial error; personal liability is neither desirable, nor, in most cases, necessary to correct judicial errors. *See, e.g., Forrester,* 484 U.S. at 227, 108 S.Ct. 538.

■ Immunity extends as far as judicial acts that also happen to be malicious or corrupt, but it does *not* extend to activities performed by the judge in an *unofficial* capacity. *See Stump,* 435 U.S. at 350, 98 S.Ct. 1099; *Forrester,* 484 U.S. at 227, 108 S.Ct. 538; *Bradley,* 80 U.S. at 346–347, 349, 13 Wall. 335. A precise definition of this class of "official" acts has never been undertaken by the United States Supreme Court. *See Forrester,* 484 U.S. at 227, 228, 108 S.Ct. 538. However cases do distinguish between official and unofficial acts of judges for the purposes of immunity. *See id.; see also Stump,* 435 U.S. at 350, 98 S.Ct. 1099.

The Supreme Court's 1871 decision in *Bradley* provides the foundation for modern analyses of immunity in the context of questionable judicial actions. *See Bradley,* 80 U.S. 335, 13 Wall. 335, 20 L.Ed. 646; *Stump,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331. In *Bradley,* the Court grappled with the very same issue before this Court today: namely, whether a Judge's failure to observe accepted procedure defeats judicial immunity such that the Judge could be held personally liable in damages under the equivalent of 42 U.S.C

1. Cappello's complaint alleges that he was beaten in jail and that he contracted tuberculosis, in addition to the monetary losses he suffered as a result of being away from work for 15 days. (*See* Compl. at ¶¶ 23–27.)

§ 1983. *See Bradley,* 80 U.S. 335, 13 Wall. 335, 20 L.Ed. 646.[2] Under circumstances similar to the present case, Justice Field found that it did not. *See id.* at 357, 13 Wall. 335.

In 1867, attorney Joseph H. Bradley represented John H. Suratt at trial for the assassination of President Lincoln. *See Bradley,* 80 U.S. 335, 13 Wall. 335, 20 L.Ed. 646. The jury failed to reach a verdict in the case. After dismissing them, Justice George P. Fisher recited an order into the record condemning Mr. Bradley for allegedly threatening the Judge with "personal chastisement" during a recess. *Id.* at 337, 13 Wall. 335. The Judge concluded his remarks by ordering that Bradley's name "be stricken from the roll of attorneys practicing in this court." *Id.* at 337, 13 Wall. 335.

In *Bradley,* as in *Cappello,* the appellate level court found that the trial judge "possessed no power to punish the plaintiff on account of contemptuous conduct". *Bradley,* 80 U.S. at 345, 13 Wall. 335; *see also Cappello v. Cappello,* 274 A.D.2d 539, 712 N.Y.S.2d 42, 2000 N.Y.Slip Op. 07195 (2000),. Accordingly, Bradley was reinstated as an attorney in that district. *Bradley,* 80 U.S. at 346, 13 Wall. 335.

Bradley, like Cappello, then sued the Judge for damages under the equivalent to 42 U.S.C. § 1983, claiming the Judge was personally liable because he had acted without jurisdiction. *See Bradley,* 80 U.S. at 335, 13 Wall. 335; *Cappello,* 274 A.D.2d 539, 712 N.Y.S.2d 42, 2000 N.Y.Slip Op. 07195. Bradley asserted that he had had no notice "of any kind", *id.* at 338, 13 Wall. 335, and that Judge Fisher was "without

. . . jurisdiction to make the order". *Id.* at 339, 13 Wall. 335. The charges are virtually identical to Cappello's against Justice Lefkowitz. (*See* Compl. at ¶¶ 21–23.); *see also Cappello,* 274 A.D.2d 539, 712 N.Y.S.2d 42, 2000 N.Y.Slip Op. 07195. Despite the fact that Justice Fisher was without jurisdiction to order Bradley stricken from the list of attorneys, the Supreme Court held that Justice Fisher could not be held personally liable in damages. *Bradley* at 357, 13 Wall. 335.[3]

The *Bradley* Court held that immunity extends to all judicial acts "even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." *Bradley,* 80 U.S. at 351, 13 Wall. 335; *see also Stump,* 435 U.S. at 364–365, 98 S.Ct. 1099. The Court explained that this was:

> [N]ot for the protection of the malicious judge . . . but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence, and without fear of consequences. *Bradley,* 80 U.S. at 349, 13 Wall. 335 (quoting *Scott v. Stansfield,* 3 Law Reports, Exchequer 220).

According to Justice Field, the relevant inquiry focused on whether the judge acted "in excess of jurisdiction" or in the "clear absence of all jurisdiction". *Bradley,* 80 U.S. at 352, 13 Wall. 335. Subsequent decisions have maintained this distinction, clarifying those two categories of activity. *See Stump,* 435 U.S. at 349–350, 98 S.Ct. 1099; *Mireles,* 502 U.S. at 11–12, 112 S.Ct. 286; *Tucker,* 118 F.3d at 933.

---

**2.** 42 U.S.C 1983 provides in pertinent part:
Every person who, under color of any statute, ordinance, . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . .

**3.** Justice Field wrote that the very reversal of the erroneous order itself removed the groundwork for any further relief to Plaintiff:

> The law which he successfully invoked, and which protected him when he complained . . . must now equally avail for the protection of the defendant [Judge], when it is attempted to give to [that court] a position and power which were then denied.

*Bradley,* 80 U.S. at 345, 13 Wall. 335. By contrast, in *Cappello,* the alleged damages are not necessarily remedied by the appellate reversal of contempt.

Justice Field gave the example of a probate judge who proceeded to try parties for "public offences". *Bradley*, 80 U.S. at 352, 13 Wall. 335. The judge who does so knowingly exercises "usurped authority," and judicial immunity will not protect him from liability. *Id.* By contrast, the judge of a criminal court who tries and sentences a defendant for an act which is not a crime, or who imposes a greater sentence than is authorized by law, cannot be held personally liable for his actions because they are merely "in excess" of jurisdiction. *Id.* at 352, 13 Wall. 335.

Since 1871, the Supreme Court has clarified—without overturning—many of the subtle boundaries of immunity originally set forth in *Bradley*. In *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court held that judicial immunity was not diminished by the existence of 42 U.S.C. § 1983. That decision was given practical effect in *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), in which the Court confirmed immunity from suit under § 1983 for one judge's acts, despite the devastating consequences of his failure to follow procedure. In *Stump*, the mother of a "somewhat retarded" 15 year old girl approached Justice Stump with a petition compelling surgical sterilization of her daughter. *Stump*, 435 U.S. at 349, 98 S.Ct. 1099. The petition was approved "the same day in an ex parte proceeding without a hearing and without notice to the daughter or appointment of a guardian ad litem." *Id.* The operation was performed, and the daughter was told she had her appendix removed. *Id.* Several years later, the young woman married and could not conceive children. *Id.* She discovered she had been sterilized, and brought a § 1983 action against the judge. *Id.* Focusing on the "judicial nature" of Justice Stump's actions, the Court held that judicial immunity protected Justice Stump from liability for his actions, *notwithstanding his "failure to comply with elementary principles of procedural due process." Id.* at 350, 98 S.Ct. 1099 (emphasis added).

In the 1988 case of *Forrester v. White*, 484 U.S. at 227, 108 S.Ct. 538, the Court clarified the nature of the acts for which a judge can claim immunity, separating those acts which are "truly judicial", or deserving of immunity, from "acts that simply happen to have been done by judges", for which there is no immunity. The *Forrester* Court articulated that "immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches." *Forrester* at 227, 108 S.Ct. 538. In other words, judicial immunity resides in the *position* of the person who performs the judicial function, not in the *person* who at times performs judicial functions. This clarification is consistent with *Bradley*, and with later decisions, in that the Court uniformly holds that the benefit to the public of an independent judiciary outweighs the benefit of immunity to any particular judge. *See, e.g., Forrester*, 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 and *Bradley*, 80 U.S. 335, 13 Wall. 335, 20 L.Ed. 646.

In *Forrester*, the Court declined to extend immunity to a judge who had fired a probation officer employee in violation of Title VII. *Forrester* at 229, 108 S.Ct. 538. The decision was based on the determination that the judge was acting in an *administrative* —not judicial—capacity when he fired the employee, and could not meaningfully be distinguished from a district attorney or anyone else who makes employment decisions. *Forrester* at 229, 108 S.Ct. 538. Because the defendant judge was not performing a judicial function when the Title VII violation occurred, judicial immunity did not protect him from personal liability. *See Forrester*, 484 U.S. at 230, 108 S.Ct. 538.

With *Mireles v. Waco* in 1991, 502 U.S. 9, 11–12, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991), the Court specified that judicial immunity is only overcome in two circumstances: 1) when a judge performs nonjudicial functions (i.e., administrative tasks etc.), and 2) when a judge acts "in the

complete absence of all jurisdiction" (i.e., no jurisdiction over the matter or the parties). Both circumstances can be seen as aspects of *Bradley*'s "absence of jurisdiction" category, as opposed to altering *Bradley*'s "in excess of jurisdiction" category for which immunity is retained. *Bradley*, 80 U.S. at 351–352, 13 Wall. 335.

In view of these authorities, imposition of § 1983 on Justice Lefkowitz would be impossible in this case. Hon. Joan B. Lefkowitz is a New York State Supreme Court Justice in a court of general jurisdiction. She was acting in her judicial capacity when she held Plaintiff in contempt without affording him notice and an opportunity to be heard.

The situation cannot be compared to *Forrester*, where the judge violated Title VII in his capacity as an *employer*, not as a judge. Nor can any similarities be drawn to *Bradley*'s probate judge, who had no jurisdiction over criminal matters. The almost eerily exact parallels are *Bradley* and *Stump*: Justice Fisher overreacted to Bradley and summarily disbarred him in much the same way Justice Lefkowitz overreacted to Cappello and summarily incarcerated him. Justice Stump's *ex parte* approval of a sterilization order is a far more egregious act, yet he was immune from liability because it was a judicial act. Judges cannot be held personally liable for judicial mistakes. Therefore, Plaintiff has failed to state a claim "upon which relief can be granted" with respect to defendant Lefkowitz, and all claims against her are dismissed. Fed.R.Civ.Proc. 12(b)(6).

*Remaining State Defendants*

Plaintiff's federal claims against the remaining State defendants—the State of New York, Grievance Committee for the Ninth Judicial District, and Grievance Committee Attorney Fuchs—are similarly deficient. Plaintiff claims civil rights violations under 42 U.S.C. §§ 1981, 1983, 1985, 1986 and under the Fourth and Fourteenth Amendments. (Compl.¶¶ 31–36.) All claims against defendants State of New York and the Grievance Committee for the Ninth Judicial District are absolutely barred by the Eleventh Amendment. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Sassower v. Mangano*, 927 F.Supp. 113, 121 (S.D.N.Y. 1996) (claims against Grievance Committee, an arm of the state, are barred). Federal interpretation of *state* law, *vis a vis* the conduct of a *state* official, is similarly prohibited by the Eleventh Amendment, therefore the claims against defendant Fuchs are also barred. *Pennhurst* at 106, 104 S.Ct. 900. Thus all claims against the State of New York, the Grievance Committee, and defendant Fuchs are dismissed. Fed.R.Civ.Proc. 12(b)(6).

For the foregoing reasons, the federal claims are dismissed with respect to all State defendants.

I decline to exercise pendant jurisdiction over the remaining state law claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (federal court that dismisses all federal claims before trial should also dismiss state claims for resolution in state court).

The complaint is dismissed as against defendants Lefkowitz, The State of New York, the Grievance Committee for the Ninth Judicial District and Attorney Fuchs.

This constitutes the decision and order of the Court.